Donald R. Alvarez – 006160
William C. Knoche – 010030
**ALVAREZ & GILBERT**
2727 N. Third Street, #300
Phoenix, AZ 85004
Tel: 602-263-0203
Fax: 602-265-9480

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| MICHELLE P. TRAVELER, an individual;<br><br>Plaintiff,<br><br>v.<br><br>GLENN JONES FORD LINCOLN MERCURY 1987, INC., an Arizona corporation;<br><br>Defendant. | Case No. CV05-0817 PHX SRB<br><br>**DEFENDANT GLENN JONES' SEPARATE STATEMENT OF PERTINENT FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to LRCiv 56.1(a), Defendant GLENN JONES states:

**I.  BACKGROUND**

1. Defendant GLENN JONES FORD LINCOLN MERCURY, INC. is an Arizona corporation and is an automobile dealership licensed by the State of Arizona to sell new and used vehicles. See Complaint ¶¶ 6-7.

2. Some time before 12/11/04, Plaintiff received, from Capital One Auto Finance, a Pre-Approved Auto Financing Event voucher returnable at GLENN JONES' dealership. See Exhibit 1 attached. See also Exhibit 2: p. 65, l. 9-20.[1]

3. As a result, Plaintiff called GLENN JONES and spoke with Sales Manager Corey Means, the contract person listed on the voucher. Exhibit 1. See also Corey Means Affidavit

---
[1] Exhibit 2 contains pertinent pages of Plaintiff's 05/20/05 deposition transcript.

attached, ¶ 2. An appointment was then set for Plaintiff on 12/11/04 at the dealership. Means Affidavit, ¶ 2.

4. On 12/11/04, Plaintiff met with GLENN JONES' salesman, Mike Mitchell, and Plaintiff gave Mitchell the Capital One voucher. Mitchell then had Capital One's website accessed to verify the specific terms of Plaintiff's pre-approval with Capital One. See Mike Mitchell Affidavit attached, ¶ 2. Means Affidavit, ¶ 4.

5. During the meeting, Plaintiff asked whether her credit had to be accessed. Mitchell told Plaintiff that GLENN JONES would not have to access Plaintiff's credit report so long as Capital One financed the vehicle purchase under the specific terms of the Pre-Approval. But, he also told Plaintiff that Capital One would access Plaintiff's credit report. The Pre-Approval voucher specifically said such as well. Exhibit 1. Mitchell Affidavit, ¶ 4. Exhibit 2: p. 72, l. 8-12; p. 133, l. 21-23; p. 136, l. 20-24.

6. The report from Capital One approved Plaintiff for a loan up to $20,000.00 with other terms and conditions, including as follows:

- Must prove income as stated
- Provide proof of residence
- Provide information on specific vehicle to be purchased
- Must trade an open auto

See Exhibit 3 attached. Mitchell Affidavit, ¶¶ 5-6.

7. Plaintiff then looked at vehicles on GLENN JONES' lot, including a Cadillac DTS, but found nothing she could afford using the Capital One Pre-Approval. Plaintiff was looking for a newer, low mileage, higher-end vehicle, such as a Cadillac, Lexus, or BMW, the cost of which exceeded the $20,000.00 Pre-Approval. Mitchell Affidavit, ¶ 7.

2

8. As Plaintiff was about to leave the dealership, Mitchell said he would continue looking for a vehicle for Plaintiff which fit within her price range. A few days later Mitchell called and Plaintiff said she was still interested in a vehicle. They discussed again Plaintiff's general parameters and Mitchell made a note of such. See Exhibit 4 attached. Mitchell Affidavit, ¶ 8.

9. On approximately 12/20/04, Mitchell found a Cadillac Catera in Plaintiff's price range and Mitchell prepared a preliminary Deal Jacket Cover Sheet. Exhibit 5 attached. Mitchell Affidavit, ¶ 9.

10. On 12/21/04, Mitchell ran a Kelley Blue Book Breakdown (Exhibit 6 attached), obtained a calculated payment report (Exhibit 7 attached), and obtained another Capital One application status report (Exhibit 8 attached). Mitchell Affidavit, ¶ 10.

11. That same day, Mitchell called Plaintiff about the Catera. Plaintiff was familiar with the model but felt it was too small for her children. Mitchell Affidavit, ¶ 11.

12. Plaintiff then asked whether the Cadillac DTS she had looked at during her visit was still available. Mitchell said that it was but the price exceeded the $20,000.00 Capital One limit. Mitchell Affidavit, ¶ 12.

13. Mitchell then suggested that if Plaintiff really wanted the DTS she might have to make a down payment to get the deal done through Capital One. Plaintiff said she had no money for a down payment and asked if GLENN JONES could get her financed through a different lender on the DTS. Mitchell said he would try, but GLENN JONES would need to run her credit in order to submit the deal to other lenders. Plaintiff agreed. Mitchell Affidavit, ¶ 13.

14. Mitchell told Plaintiff that he would need additional information from her (including full name, previous addresses, date of birth, social security number, employer, wages, etc.) in order to pull her credit report and to submit to other lenders. Mitchell Affidavit, ¶ 14.

15. Plaintiff then provided this information to Mitchell and Mitchell recorded it on a Purchaser's Statement form GLENN JONES uses for prospective purchasers. See Exhibit 9 attached. Mitchell Affidavit, ¶ 14.

16. On 12/21/04, GLENN JONES pulled Plaintiff's credit report (see Exhibit 10 attached) and then submitted payment calls and/or loan packages to multiple lenders to see if Plaintiff could be approved for a loan. Mitchell Affidavit, ¶ 15.[2] Means Affidavit, ¶ 5.

17. On 12/23/04, Corey Means went on the Dealertrack.com website to check if any lender, to whom Plaintiff's information had been submitted, approved Plaintiff for credit. The report reflected only the 12/11/04 Capital One Pre-Approval and rejections by five of the other lenders to whom the information had been submitted. See Exhibit 11 attached. Mitchell Affidavit, ¶ 16. Means Affidavit, ¶ 6.

18. Mitchell then called Plaintiff and told her she did not get approval for a loan on the Cadillac DTS. He told her, if she still wanted a car, he would have to go back to the original Capital One $20,000.00 Pre-Approval, but a down payment would be required. Plaintiff said she still could not provide a down payment. Mitchell then told her he would continue trying to find a lender and would let her know if he did. Mitchell Affidavit, ¶ 17.

19. Despite some additional efforts during the next week, GLENN JONES was unable to obtain financing for Plaintiff on the DTS. Mitchell Affidavit, ¶ 18. Means Affidavit, ¶ 7.

20. During her deposition, Plaintiff was questioned in detail concerning all of her conversations and communications with GLENN JONES personnel prior to her credit report being accessed. At no time during her deposition testimony did Plaintiff say that she prohibited GLENN JONES from accessing her credit. She testified that the only time she talked about

---

[2] In a payment call, information is submitted concerning the proposed borrower and each lender is asked whether it will extend credit and on what terms. When a loan package is submitted, a lender is asked to approve a loan for a particular sale. Mitchell Affidavit, ¶ 15. Means Affidavit, ¶ 5.

accessing her credit was during her initial conversations with a GLENN JONES' representative on 12/11/04, the date she visited the dealership. She further testified that, during the conversation, she asked only whether her credit report would be run and the GLENN JONES' representative said Capital One would do so with respect to using the voucher. Further, according to Plaintiff, during all other conversations with GLENN JONES personnel prior to GLENN JONES running her credit report, that issue never came up. Exhibit 2: p. 68, l. 11-16; p. 72, l. 8-25; pp. 73-93; p. 94, l. 1-2.

21. On 01/25/05, Plaintiff sent a letter to GLENN JONES accusing it of unlawfully accessing her credit and of causing a negative impact on her credit score. See Exhibit 12 attached.

22. The next day (01/26/05), GLENN JONES' General Manager, Mike Underwood, called Plaintiff about her letter. She told Underwood that she never gave GLENN JONES authority to obtain her credit report and that she was entitled to $2,500 from GLENN JONES under federal law. Underwood said he would investigate the matter and, when Underwood asked about the federal law to which Plaintiff had referred, Plaintiff emailed him a copy of her 01/25/05 letter, with a link to certain federal statutes. See Exhibit 13 attached. Mike Underwood Affidavit, ¶ 2-4. See also Exhibit 2: p. 98, l. 22-25; p. 99, l. 1-12.

23. After investigating the matter, Underwood turned the matter over to GLENN JONES' attorney. Underwood Affidavit, ¶ 5.

24. On 01/31/05, GLENN JONES' attorney sent Plaintiff a letter explaining the facts, advising her GLENN JONES did nothing wrong, and asking her to cite the specific statutes she believed GLENN JONES violated and which entitled her to $2,500. See Exhibit 14 attached.

25. Plaintiff never responded. Instead on 03/17/05, she filed this suit.

## II. PLAINTIFF'S CREDIT HISTORY BEFORE DEALING WITH GLENN JONES.

26. The 12/21/04 Credit Report GLENN JONES obtained on Plaintiff showed, among other things:

   A. A credit score of only 489.

   B. Eleven prior delinquent account entries.

   C. At least five accounts that had been placed in collection since 02/02.

   D. At least $121,000+ in outstanding student loans.

   E. Twenty one prior inquiries since 01/11/03.

   See Exhibit 10 attached.

27. At her deposition, Plaintiff testified that, when she first dealt with GLENN JONES, she had additional debts as follows:

   A. She owed $166,000 for first and second mortgages on her home.

   B. She had outstanding credit card debts.

   C. She had another account in collection not listed in the credit report.

   D. She had not paid a number of her delinquent debts.

   E. There may have been other debts which she could not recall.

   Exhibit 2: p. 105, l. 1-24; p. 145, l. 2-25; p. 146, l. 1-25; p. 147, l. 1-25; p. 148, l. 1-14.

28. At her deposition, Plaintiff further acknowledged at least $121,000+ in unpaid student loans and that interest continues to run on portions of the loans. Exhibit 2: p. 148, l. 15-25; p. 149, l. 1-25; p. 150, l. 1-19.

29. At the time she dealt with GLENN JONES, Plaintiff was earning only approximately $4,000 gross per month. Exhibit 2: p. 110, l. 17-19.

## III. PLAINTIFF'S CREDIT HISTORY SUBSEQUENT TO DEALING WITH GLENN JONES.

30. On 03/24/05 and 03/31/05, Credit Reports were run on Plaintiff in connection with her attempts to obtain financing to purchase a vehicle through Pinnacle Nissan/Infiniti. See Exhibits 15 and 16 attached.

31. These Credit Reports show most of the same debts and other problems disclosed by Plaintiff's 12/21/04 Credit Report. In addition, they also show:

    A. Plaintiff's credit score had actually improved since 12/21/04. She scored 576 under the Trans Union Custom Score and 497 under the New Empirica.

    B. Since the 12/21/04 GLENN JONES inquiry, there were eight additional credit inquiries into Plaintiff's credit as of 03/24/05 and twelve as of 03/31/05.

## IV. PLAINTIFF'S CLAIMS AND DAMAGES

32. The basis for Plaintiff's claim is that GLENN JONES' accessed her Credit Report without her permission and without a permissible purpose. Complaint, ¶¶ 42 – 45, 54. All of Plantiff's claims are premised on this contention. Exhibit 2: p. 223, l. 25; p. 224, l. 1-7.

33. Plaintiff does agree that a permissible purpose for obtaining a Credit Report would be in an attempt to extend credit for the purpose of purchasing a motor vehicle. Exhibit 2: p. 116, l. 17-22.

34. When questioned at her deposition regarding her claim that GLENN JONES had no permissible purpose for accessing her credit report, Plaintiff testified as follows:

> "Q. Now, do you know what the permissible purposes are under that section of the law [§1681(b)(f)]?
>
> A. No, I do not.

> Q. Do you know what permissible purposes are under any section of the Fair Credit Reporting Act?
>
> A. No.
>
> Q. So then you can't tell me, as you sit her today, that the purposes Glenn Jones had in mind for securing your credit report were either permissible or impermissible under the statute; correct?
>
> A. Correct.
>
> Q. And if you look at paragraph 44 [of the Complaint], it talks about a lawful purpose. You don't know what purposes are lawful, permissible or appropriate under that particular section of the law; correct?
>
> A. Corrrect.
>
> Q. I think I asked you this question before, but do you have any reasons to believe that Glenn Jones accessed your credit report for any other reason than to see if it could obtain financing for you to assist you in the purchase of a motor vehicle?
>
> A. No."

Exhibit 2: p. 215, l. 24-25; p. 216, l. 1-20, bracketed material added.

35. When Plaintiff was questioned concerning her consumer fraud claim under A.R.S. §44-1522, she stated that the sole basis for her claim was that GLENN JONES "attempted to sell me a vehicle that I didn't want." Exhibit 2: p. 224, l. 13-25; p. 225, l. 1-2.

36. And, she had no idea concerning the basis for her common law fraud claim. Exhibit 2: p. 225, l. 3-13.

37. Plaintiff also generally claims she suffered actual damages, damages for humiliation and embarrassment, damages for loss of opportunity, or, in the alternative, that she is entitled to statutory damages in an amount of "not less than $100 and not more than $1,000." She

also claims entitlement to punitive damages. Complaint, ¶¶ 48-50, 52, 55, 58, 59, 63, 67, and VII Prayer for Relief.

38. Regarding actual damages and lost opportunity damages, Plaintiff testified that because GLENN JONES accessed her credit report, she believes she was prevented from obtaining a $40,000 home equity loan, which she intended to use in starting and developing an internet networking website. Exhibit 2: p. 100, l. 19-24; p. 221, l. 22-25; p. 222, l. 1-16.

39. Plaintiff further testified that she was told she was denied the home equity loan in 02/05 – 03/05 because her credit score was 465 but had to be at least 475. Exhibit 2: p. 100, l. 25; p. 101, l. 1-25; p. 102, l. 1-25; p. 103, l. 1-2.

40. However, Plaintiff admitted that she has nothing to show that GLENN JONES' inquiry into her credit prevented her from obtaining a home equity loan. Exhibit 2: p. 120, l. 16-21; p. 122, l. 24-25, p. 123, l. 1-7.

41. Further, as of 03/05, Plaintiff's credit scores were 497 and 576, well above what she claims she was told she needed. Exhibits 15 and 16.

42. And, Plaintiff has not disclosed anything to substantiate this claim of actual/lost opportunity damages either. See Exhibit 17 and 18.[3]

43. By letters dated 05/02/05 and 06/03/05, GLENN JONES' attorney requested, among other things, any documents substantiating Plaintiff's claims, including this lost opportunity claim. Exhibits 19 and 20 attached. Plaintiff has failed to produce anything.

44. Regarding her claimed humiliation and embarrassment damages, Plaintiff says these are related to her not obtaining the home equity loan as well. Exhibit 2: p. 120, l. 1-8.

45. When asked, she could not even say how her claimed humiliation and embarrassment damaged her. Exhibit 2: p. 126, l. 12-22.

---

[3] Exhibits 17 and 18 are copies of Plaintiff's Initial and Supplemental Disclosures.

9

46. In fact, Plaintiff testified she was "not sure" about any other damages she may claim to have suffered as a result of anything GLENN JONES did. Exhibit 2: p. 126, l. 12-22.

47. As of this date, Plaintiff has produced nothing to substantiate that she suffered any damages, let alone a calculation of how much she claims to have suffered. Exhibits 17 and 18.

48. Plaintiff was denied credit with the lenders to which GLENN JONES submitted her credit information because she had serious delinquencies, excessive obligations, delinquent past or present credit obligations, and collections filed. See Exhibit 21 attached.[4]

RESPECTFULLY SUBMITTED this 23rd day of August, 2005.

ALVAREZ & GILBERT

By: Donald R. Alvarez
William C. Knoche
Attorneys for Defendant

COPY of the foregoing mailed
this 23rd day of August, 2005, to:

Floyd W. Bybee
FLOYD W. BYBEE, PLLC
2173 E. Warner Road, Suite 101
Tempe, Arizona 85284
Attorney for Plaintiff

By: Donald R. Alvarez

---

[4] Exhibit 21 consists of copies of lender rejections letters produced by Plaintiff which she received from those lenders.