WO

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle P. Traveler, | No. CV-05-0817-PHX-SRB |
| Plaintiff, | **ORDER** |
| vs. | |
| Glenn Jones Ford Lincoln Mercury 1987, Inc., an Arizona corporation, | |
| Defendant. | |

In December 2004, Plaintiff Michelle P. Traveler visited Defendant Glenn Jones Ford Lincoln Mercury, an auto dealership, to look at cars. Plaintiff subsequently filed a Complaint with this Court alleging that Defendant had unlawfully accessed her credit report after her visit. Pending before the Court is Defendant's Motion for Summary Judgment presumably brought pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. 19).

**I.     BACKGROUND[1]**

Around December 2004, Plaintiff received an offer in the mail from Capital One Auto Finance ("Capital One") stating that she had been pre-approved for a no-money-down loan to buy a vehicle from Defendant's auto dealership ("Defendant" or "dealership") for a limited time that month. Plaintiff visited the dealership on or about December 11 and met with a

---

[1]The following facts are undisputed, except where noted.

salesman. Plaintiff asked the salesman whether the dealership would need to access her credit report, as she was aware that credit inquiries could pull down one's credit score, and the salesman assured her the dealership would not. (Pl.'s Resp. to Def.'s Separate Statement of Pertinent Facts in Support of its Mot. for Summ. J. and Pl.'s Controverting Statement of Facts in Opposition ("PSOF"), Ex. A (hereinafter "Traveler Aff."), ¶¶ 4, 13.) When Plaintiff did not find a vehicle she wanted to buy within Capital One's pre-approval price range, she left the dealership.

Plaintiff says her next contact with Defendant occurred several weeks later, when the salesman called to tell her that Capital One had extended its credit offer. (Traveler Aff., ¶ 7.) Plaintiff asked about available vehicles within Capital One's price limit, but the car the salesman told her about did not fit her family's needs and she agreed he could continue looking for a suitable vehicle. (Traveler Aff., ¶¶ 9-11.)

In January 2005 Plaintiff began receiving letters from various finance companies turning her down for financing through the dealership. (Traveler Aff., ¶ 14.) Plaintiff learned later that in December 2004 Defendant had accessed her credit reports from each of the three national credit bureaus. (Traveler Aff., ¶ 8.) Plaintiff states that "she did not instruct [the salesman] to seek alternative financing nor did I in any way authorize him or the dealership to access my credit report" and that only Capital One had permission to access her report in December 2004. (Traveler Aff., ¶¶ 11, 19.) Plaintiff says that at the time Defendant accessed her credit reports, she had not agreed to buy any vehicle from Defendant or "initiated any transaction with [Defendant] to purchase a vehicle on credit." (Traveler Aff., ¶¶ 12, 20.)

Defendant's version of what transpired after Plaintiff's initial visit to the dealership differs significantly. Defendant agrees that the salesman told Plaintiff at their initial meeting that the dealership would not need to access Plaintiff's credit report, as long as Capital One financed the vehicle under the terms of its offer. (Def.'s Separate Statement of Pertinent Facts in Support of its Mot. for Summ. J. ("DSOF"), affidavit of Michael Mitchell (hereinafter "Mitchell Aff."), ¶ 4.) Capital One pre-approved Plaintiff for a loan up to

1  $20,000, but Plaintiff did not find a car that day within that price range. (Mitchell Aff., ¶ 7.)

2    A few days later the salesman called Plaintiff to see if she was still interested in
3  buying a vehicle and, if so, her general parameters. (Mitchell Aff., ¶ 8.) The salesman called
4  Plaintiff again on December 20 to tell her he had found a car within Plaintiff's price range,
5  a Cadillac Catera. (Mitchell Aff., ¶¶ 9, 11.) Plaintiff told the salesman that the Catera was
6  too small for her family, and Defendant says Plaintiff then asked whether a Cadillac DTS she
7  saw on her initial visit was still available. (Mitchell Aff., ¶¶ 11-12.) The salesman told her
8  it was still available, but reminded Plaintiff that the price on the Cadillac DTS still exceeded
9  Capital One's $20,000 limit. (Mitchell Aff., ¶ 12.) The salesman then suggested that
10 Plaintiff could make a down payment, but Plaintiff said she could not afford a down payment
11 and asked whether Defendant could obtain financing for the Cadillac DTS through a different
12 lender. (Mitchell Aff., ¶ 13.) Defendant claims that the salesman said he would try to obtain
13 financing through a different lender, but that the dealership "would need to run her credit in
14 order to submit the deal to other lenders." (Mitchell Aff., ¶ 13.) Crucially, Defendant alleges
15 that Plaintiff "said that would be okay." (Mitchell Aff., ¶ 13.) The salesman said that
16 Plaintiff then provided him with the information he would need in order to pull her credit to
17 submit to other lenders, including her "full name, previous addresses, date of birth, social
18 security number, employer, wages, etc." ( Mitchell Aff., ¶ 14.) The salesman recorded this
19 information on a Purchaser's Statement, accessed Plaintiff's credit report and submitted
20 "payment calls and/or loan packages to multiple lenders to see if Plaintiff could be approved
21 for a loan." (Mitchell Aff., ¶¶ 14-15.)

22   On December 23, 2004, Defendant's Sales Manager went on Dealertrack.com to see
23 if any of the lenders had approved Plaintiff for credit and found that the five new lenders had
24 rejected Plaintiff for credit. (DSOF, Affidavit of Corey Means (hereinafter "Means Aff."),
25 ¶ 6.) The salesman then called Plaintiff to let her know that she did not get approval for a
26 loan on the Cadillac DTS and that they could go back to the Capital One offer, but that
27 Plaintiff would have to provide a down payment. (Mitchell Aff., ¶ 17.) Again, Plaintiff said

28

1  she could not afford a down payment, and the salesman told Plaintiff he would continue
2  trying to find a lender and would let her know if he did. (Mitchell Aff., ¶17.)

3  After learning that Defendant had accessed her credit report, Plaintiff filed suit
4  claiming that Defendant violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681
5  *et seq.*, the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 *et seq.*, and committed
6  common law fraud. Specifically, Plaintiff claims violations of 15 U.S.C. §§ 1681b(f), 1681n,
7  1681o, 1681q[2] and Ariz. Rev. Stat. § 44-1522. Plaintiff testified during her deposition that
8  because Defendant accessed her credit report, and because of the inquiries from financing
9  companies, her credit score was lowered, which she believes prevented her from obtaining
10 a $40,000 home equity loan. (DSOF, Ex. 2, Deposition of Michelle Traveler (hereinafter
11 "Traveler Dep.") at 120.) Plaintiff testified that one lender told her that their low score
12 requirement [presumably for granting a loan request] was 475, and her score was 465.
13 (Traveler Dep. at 103.)

14 Defendant filed the instant Motion for Summary Judgment arguing that no genuine
15 issue of material fact exists because Defendant accessed Plaintiff's credit report for a
16 permissible purpose, did not make any false promise or misrepresentations to Plaintiff, and
17 because Plaintiff has not suffered any damages due to Defendant's actions. (Def.'s Mot. for
18 Summ. J. at 1.)

19 **II.    LEGAL STANDARDS AND ANALYSIS**

20 The standard for summary judgment is set forth in Rule 56(c) of the Federal Rules of
21 Civil Procedure. Under this rule, summary judgment is properly granted when: (1) no
22 genuine issues of material fact remain; and (2) after viewing the evidence most favorably to
23 the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R.
24 Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986);
25 *Eisenberg v. Ins. Co. of N. Am.,* 815 F.2d 1285, 1288-89 (9th Cir. 1987).

---

27 [2]Although Plaintiff identified 15 U.S.C. § 1681q in her factual allegations, she failed
to include a claim under § 1681q in her causes of action. Therefore, Plaintiff has waived any
28 cause of action under § 1681q.

- 4 -

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex,* 477 U.S. at 324, 106 S. Ct. at 2548; *Eisenberg,* 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings, it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2513-14 (1986) (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S. Ct. 1575, 1592 (1968).

### A.   Fair Credit Reporting Act Claim

Under the FCRA, a consumer reporting agency may only furnish a consumer report under certain specified circumstances. *See* 15 U.S.C. § 1681b(a). For instance, a consumer reporting agency may furnish a consumer report "[i]n accordance with the written instructions of the consumer to whom it relates." *Id.* § 1681b(a)(2). Also, a person who "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished" may have access to a consumer's report. *Id.* § 1681b(a)(3)(A). Or, a person who "has a legitimate business need for the information . . . in connection with a business transaction that is initiated by the consumer" may access that consumer's report. *Id.* § 1681b(a)(3)(F)(i). In the latter two instances, a consumer's permission is not required to access the consumer's report. *See* 16 C.F.R. Pt. 600, App. (2005) ("When permissible purposes exist, parties may obtain, and consumer reporting agencies may furnish, consumer reports without the consumers' permission or over their objection."). In all cases, though, a person may not use or obtain a consumer report unless the report is obtained "for a purpose for which the consumer report is authorized to be furnished under this section . . . ." *Id.* § 1681b(f)(1).

Plaintiff claims that Defendant violated § 1681b(f) of the FCRA when it accessed and used Plaintiff's credit report, and that Defendant's failure to comply with FCRA was negligent and/or willful under §§ 1681n and 1681o. (Compl. ¶¶ 42-45, 48-50.) Defendant

- 5 -

acknowledges that it accessed Plaintiff's credit report on December 21, 2004. (Def.'s Mot. for Summ. J. at 5 n. 3; Means Aff., ¶ 5.) Defendant claims, however, that it had a permissible purpose under either 15 U.S.C. § 1681b(a)(3)(A) or § 1681b(a)(3)(F)(i). (Def.'s Mot. for Summ. J. at 5.)

Plaintiff agrees that it would be permissible for a person to obtain a credit report for the purpose of attempting to extend credit for the purchase of a vehicle. (Traveler Dep. at 116.) What Plaintiff disputes is that she authorized Defendant to seek alternative financing or to access her credit report. (Traveler Aff., ¶ 11.) Plaintiff states that except for Capital One, "[a]t no time did I ever sign any authorization or give verbal authorization for [Defendant] or anyone else to pull my credit report." (Traveler Aff., ¶¶ 18-19.) In her affidavit, Plaintiff states that "[d]uring this time, I had not initiated any transaction with [Defendant] to purchase a vehicle on credit." (Traveler Aff., ¶ 20.)

In opposing Defendant's Motion for Summary Judgment, Plaintiff directs the Court's attention to two Federal Trade Commission informal staff opinion letters construing the provisions of 15 U.S.C. § 1681b. While not binding on the courts, "courts should give some weight to such [opinion letters] . . . . " *Swanson v. S. Oregon Credit Serv., Inc.*, 869 F.2d 1222, 1230 (9th Cir. 1988). One of those letters is particularly instructive in this case. *See* Letter from David Medine to Karen Coffey (Feb. 11, 1998), FTC Informal Staff Letter ("Coffey letter"). In the Coffey letter, the agency discusses the propriety of an auto dealership obtaining a consumer report on an individual who visits the showroom and requests information from a salesman about one or more automobiles. The agency opines that such "a request for general information about products and prices offered does not involve a business transaction initiated by the consumer" allowing access to a consumer report under 15 U.S.C. § 1681b(a)(3)(F). *Id.* The letter goes on to say that "an automobile dealer may obtain a report only in those circumstances in which the consumer clearly understands that he or she is initiating the purchase or lease of a vehicle and the seller has a legitimate business need for the consumer report information in order to complete the transaction." *Id.* (emphasis in original). If the consumer is merely comparison shopping, for

1 example, or asking questions about prices and financing, then "the dealer must obtain written
2 permission from the consumer before obtaining a consumer report." *Id.* A dealer may obtain
3 a report without written permission "only in circumstances where it is clear both to the
4 consumer and to the dealer that the consumer is actually initiating the purchase or lease of
5 a specific vehicle and, in addition, the dealer has a legitimate business need for consumer
6 report information . . . ." *Id.* This was also the view of one Arizona district court which held
7 that "[i]nformation on a particular consumer may only be provided to a third party who
8 requires it in connection with a specific transaction between that party and that particular
9 consumer." *Greenway v. Info. Dynamics, Ltd.*, 399 F. Supp. 1092, 1096 (D. Ariz. 1974),
10 *aff'd,* 524 F.2d 1145 (9th Cir. 1975), *cert. denied*, 424 U.S. 936, 96 S. Ct. 1153 (1976)
11 (rejecting the defendant's argument that it had a legitimate business need for obtaining a list
12 with check cashing information about hundreds of individuals with whom it may do business
13 in the future).

14 Defendant claims that it had Plaintiff's permission to access her credit report.
15 Alternatively, Defendant claims that it did not need Plaintiff's permission because it had a
16 permissible purpose either under 15 U.S.C. § 1681b(a)(3)(A) (involving a credit transaction)
17 or § 1681b(a)(3)(F)(i) (involving a business transaction initiated by the consumer).

18 Two issues of material fact arise from the varying accounts of the parties. The first
19 is whether Plaintiff actually gave Defendant permission to access her credit report. The
20 second is whether Plaintiff and Defendant were ever involved together in a "credit
21 transaction" or a "business transaction" as contemplated by 15 U.S.C. § 1681b(a)(3)(A) or
22 § 1681b(a)(3)(F)(i), in which case Defendant would not have needed Plaintiff's permission.
23 Even if Plaintiff had not given express permission to access her credit report, Defendant's
24 version of events would support the conclusion that there was a business transaction and/or
25 a credit transaction, thus obviating the need for Plaintiff's permission. Plaintiff's version,
26 however, would support the opposite conclusion–that there was neither a business transaction
27 nor a credit transaction, and that she had never given Defendant permission to access her
28 report. These differing versions of events create a genuine issue of material fact. In this

situation, summary judgment is inappropriate, and Defendant's motion on Plaintiff's FCRA claim is denied.

### B.     State Law Claims

In addition to the federal law claim, the Complaint states claims under the Arizona Consumer Fraud Act and common law fraud. Defendant's Motion for Summary Judgment addresses both state law claims and requests summary judgment on these claims. Plaintiff's Response to Defendant's Motion for Summary Judgment completely fails to address Defendant's arguments and does not even mention the state law claims.

Fed. R. Civ. P. 56(e) requires that a party opposing a motion for summary judgment must "by affidavits or as otherwise provided in this rule . . . set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate shall be entered against the adverse party."

Local Rule 7.2(i) allows the Court to summarily grant those motions where the adverse party fails to respond. D. Ariz. R. 7.2(i); *see also Brydges v. Lewis*, 18 F.3d 651, 652 (9th Cir. 1994) (discussing former Local Rule 11(i) which was later re-codified as Local Rule 1.10(i) and then 7.2(i)). The rule states in relevant part: "[I]f the opposing party does not serve and file the required answering memoranda . . . such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily." Rule 7.2(i). The Court deems Plaintiff's failure to respond to Defendant's request for summary judgment on the state law claims a consent to the Court's granting of Defendant's request. Therefore, the Court grants Defendant summary judgment on the state law claims under the Arizona Consumer Fraud Act and common law fraud.[3]

**IT IS ORDERED** granting in part and denying in part Defendant's Motion for Summary Judgment (Doc. 19). The motion is denied with respect to Plaintiff's federal law

---

[3] Because this case will proceed on the federal law claim, the Court need not address Defendant's request for attorney's fees at this time.

1 claim under the Fair Credit Reporting Act.  The motion is granted with respect to all other
2 claims against Defendant.

4        DATED this 24th day of January, 2006.

*Susan R. Bolton*
Susan R. Bolton
United States District Judge